**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No.  24-cr-00077-CRC** |
| | ) | |
| **JOHN SCHUBERT** | ) | |
| | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**DEFENDANT JOHN SCHUBERT'S SENTENCING STATEMENT**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
*Attorney for Defendant*

Defendant JOHN SCHUBERT, through his undersigned Counsel of
Record, William L. Shipley, submits this Sentencing Statement in advance of
his sentencing hearing set for July 11, 2024.

      I.    <u>Factual Background and Offense Conduct</u>.

Defendant Schubert traveled from his home in Bradenton, Florida, to
Washington D.C. with his father, step-mother, and longtime friend Lynn
Hudson, to attend the rally at the Ellipse on January 6, 2021. Mr. Schubert's
father and step-mother had been planning to attend the January 6 rally. But
Mr. Schubert and Ms. Hudson decided to accompany them only two days prior
to leaving out of concern for the physical safety of Mr. Schubert's parents given
their age.

Mr. Schubert's parents had a hotel reservation, while Mr. Schubert and
Ms. Hudson did not. If they were unable to find accommodations when they
arrived, they planned to sleep in their vehicle – which is exactly what ended up
happening. Mr. Schubert and Ms. Hudson met Mr. Schubert's parents on the
morning of January 6. Mr. Schubert's parents had attended other rallies in
Washington and knew where to go. Mr. Schubert and Ms. Hudson followed
along where they led. Ms. Hudson brought along a dog, which she kept with
her on a leash throughout the day.

Mr. Schubert expected to attend a political rally and nothing more. But
when they arrived at the Ellipse the size of the crowd and their distance from
the speakers made it difficult for them to understand the speakers. Given that
they couldn't hear well, when some in the crowd began to depart and head in
the direction of the Capitol, Mr. Schubert and his group went along. They had

no plan for what they would do when the arrived, and they had no idea what they might find.

They were among the earlier groups to arrive at the Peace Fountain.  But progress towards the Capitol was stopped by unmanned barrier of bike racks. Mr. Schubert did put his hands on the barriers but he took not part in the dismantling of the first set – that was done by others.  Mr. Schubert's group then fell in with the crowd as it moved the short distance to a second set of bike rack barriers with approximately 8 police officers behind them.  Leaving his parents and Ms. Hudson together, Mr. Schubert worked his way through the crowd towards the second set of bike-rack barriers.  He saw one man whisper into the ear of another man, and the second man then began to violently push the bike rack barriers in the direction of the officers who then retreated.  This is the well-documented episode of Ray Epps whispering into the ear of Ryan Samsel, and Samsel then pushing one of the barriers into the officers.

As the crowd surged forward Mr. Shubert was moved with it, taking him farther from his parents and Ms. Hudson.  Mr. Shubert took up a position at the top of the stairs away from the crowd and raised his arms in the air to make himself visible to his parents and Ms. Hudson.  His parents saw him, but in the crush of the crowd surging forward the three of them were separated from Ms. Hudson and her dog.  After a short period of time Mr. Schubert was able to contact Ms. Hudson by phone and learned she had opted to leave the crowd for the benefit of the dog and had walked towards the north side of the building.

Mr. Hudson and his parents followed the crowd along the path heading towards the Capitol building.  They followed to the scaffolding area on the north end of the West Plaza where the crowd had stopped and was growing.  Mr. Schubert could see police officers farther ahead and decided to move through the crowd to attempt to speak with them.  He had his parents remain farther back in the crowd.  This is the point when the confrontation involving several individuals who attacked the police line took place.  That confrontation is recounted in more detail below.

After being sprayed in the face with pepper gel – likely by another protester as that is not a police weapon – Mr. Schubert retreated to where he had left his parents.  Mr. Schubert's parents led him away to look for help to get the chemical substance off his face.  Because pepper gel is not water soluble, it took an extended period and multiple attempts for Mr. Schubert to get relief.  While doing this the group was unaware of what was happening between the crowd and the police back where Mr. Schubert had been.

After recovering somewhat, Mr. Schubert and his parents resumed trying to find Ms. Hudson.  Their efforts were hampered by the fact that they were not able to contact with her again by phone.  They made their way with the crowd to the Upper Plaza on the Senate side.  They could see a large segment of the crowd on the upper level moving towards the building and seemingly going inside.  They heard talk among those in the crowd that the police were letting people inside the building.  They had not witnessed how those who first arrived at the Senate Wing doors gained entry by breaking the doors and windows.  They were unaware of the situation at the Senate Wing doors when they joined

the crowd moving towards that entrance. They certainly heard the alarms, but the crowd ahead of them was nonetheless steadily moving inside the building at that location.

By the time Mr. Schubert and his parents entered at 2:21, hundreds of others had gone inside before them at this location – the first point of entry when the crowd breached the building at 2:13.  When Mr. Schubert and his parents reached the front, they found that their "line" was entering through a broken window, while the lines next to them were walking through the Senate Wing doors.  They had a large crowd behind them pushing forward to get inside, so Mr. Schubert helped his parents climb through the window and enter the building.

Once inside, Mr. Schubert and his parents acted in the same fashion as hundreds of others who gained access to the Capitol that day in the same or similar fashion. They walked around, took pictures and videos, committed no acts of violence or vandalism, and spoke with other people who were doing the same thing.

Mr. Schubert does not recall being in close enough proximity to the location where the shooting happened to hear or see the event.  But word quickly spread through the crowd that someone had been shot and Mr. Schubert decided it was time to take his parents and leave the building.

A short time after exiting they made contact with Ms. Hudson and the group returned to his parents' hotel.  Mr. Schubert and Ms. Hudson remained at the hotel for several hours to get some rest, and then began their drive back to Florida in the early morning hours on January 7.

II.    <u>U.S.S.C. Guideline Calculation</u>.

Mr. Schubert entered a plea of guilty to an Information charging him with a violation of 18 U.S.C. Sec. 111(a)(1).

Mr. Schubert agrees that the Presentence Report accurately sets for the application of the Sentencing Guidelines to his case, and that the Adjusted Offense Level is 17; Mr. Schubert has a Criminal History Score of 0, placing him in Criminal History Category I; and the recommended guideline range is 24-30 months.

III.   <u>Application of Sentencing Factors Under Sec. 3553(a)</u>

A.    Nature and Circumstances of the Offense, and Personal Characteristics of the Defendant.

Mr. Schubert is 48 years old and has resided in Florida for 23 years.  He lives with a long-time friend, Ms. Lynn Hudson, and until recently was a full-time care provider for Ms. Hudson's elderly father who suffered from many physical and mental health conditions.  Since the date of Mr. Schubert's Change of Plea, the Ms. Hudson's father has passed away.

Mr. Schubert is currently unemployed as he was unable to work while caring for Ms. Hudson's father.   Ms. Hudson has been a schoolteacher for more than three decades, and her income has supported their household, including her father.

1.    <u>Nature and Circumstances of the Offense</u>.

6

Contrary to the characterization offered by the Government, and notwithstanding some "loaded" and pejorative words used by the Government in the Affidavit that were then transferred to the "Statement of Offense," Mr. Schubert's encounter with the police outside the Capitol on the West Plaza was largely benign when compared to incidents involving others who actually fought with and sometimes injured the law enforcement officers at the location where Mr. Schubert had his encounter with Officer Torres on January 6.

Defense Exh. 1 is a video marked in the upper right corner by the identifier "Townhall Media." This video is 1 minute and 11 seconds in length and captures all of the events involving Mr. Schubert and Officer Torres. It does not show Mr. Schubert fighting with or "assaulting" any officer as that term is legally defined. It does show Mr. Schubert using measured force – necessary at that specific moment in that situation – which did oppose, impede and/or interfere with Officer Torres while he was engaged in the performance of his duties.

The video shows Mr. Schubert to be largely a spectator as others very near him began to actively fight with the police. Mr. Schubert was in close proximity to Officer Torres when he took action in response to others around Mr. Schubert, thereby bringing the two of them together shoulder-to-shoulder.

The following are a series of screen-shots taken from that video, but the video itself best reflects he sequence of events -- in context -- involving Mr. Schubert with Officer Torres.

The video begins with a police dispersal of a chemical agent what causes the line of protesters to retreat, creating a 6-8 foot gap between the two groups. Mr. Schubert is not shown in the video at this point.



At the :05 mark on the video, the situation is as follows:



For several seconds after the chemical agent was used, this gap between the two sides was maintained and neither side engaged in any violent conduct towards the other.

Mr. Schubert is first seen in the video at the :27 mark, to the extreme left side of the image, wearing a red visor and blue shirt.



In the 22 seconds between the 2nd and 3rd images above, there is relative "calm" between the two sides at this location.  That was the situation Mr. Schubert observed when he came forward through the crowd and is seen in the 3rd image – Mr. Schubert wasn't drawn to any ongoing "fighting" between the two sides.  As noted above, he came forward to attempt to speak with one of the officers.

 This puts into perspective the Government's claim that Mr. Schubert and other rioters "overwhelmed" the Officers.  That certainly did happen later, but it did not happen where Mr. Schubert was at the time Mr. Schubert was and Officer Torres were together.  Any suggestion in the PSR or the

Government's Sentencing Statement suggesting his involvement in that is an inaccurate characterization that portrays Mr. Schubert in a false light.

The image below is taken five seconds later, at the :32 mark, and Mr. Schubert is fully in the frame again as things remain relatively static between the two sides:



Directly to Mr. Schubert's left at this point is another individual wearing an all-black outfit, with a hood over his head, and wearing some type of face-covering.  Directly next to that individual is Officer Torres.  The three of them are focused on what is about to happen with the two individuals in the center/bottom of the image.  The person in the brown knit cap and blue shirt is starting to push the person in front of him – wearing what appears to be a flag as if it were a cape – into the line of law enforcement officers holding shields.

The video from this point forward shows the clash that resulted from that individual's conduct.

The next image comes at :34 on the video and shows that Officer Torres and the individual in all-black have moved forward towards the developing clash, and Mr. Schubert is again out of the frame. The video shows both Officer Torres and the man in all-black moved forward should-to-shoulder at the same moment while Mr. Shubert remained where he was.



The individual in all-black then moves ahead of Officer Torres. Mr. Schubert re-enters the frame of the video and with the pushing all around, Mr.

Schubert and Officer Torres end up shoulder-to-shoulder as the clash happens in front of them – with neither of them involved.

The next image is at :36 on the video.



Mr. Schubert and Officer Torres are now in shoulder-to-shoulder proximity to each other, both facing the same direction and watching a physical encounter between other protesters and the police.  In this sequence Mr. Shubert extended his left arm across the right shoulder and arm of Officer Torres to maintain the space between them and not lose his balance.  At the same time, another protester has his left forward against Mr. Schubert's right shoulder, pushing him in the direction of Officer Torres.

The next image is at :38 on the video and shows Mr. Schubert extending his left arm across the right arm of Officer Torres and leaning into him.  But neither were focused on each other, they were focused on what was happening in front of them while they were each being pushed from both sides.



The video shows "jostling" at this point between Mr. Schubert and Officer Torres, the result of their close proximity to each other and the pushing/ shoving by other persons all around them.  Other officers to the left of Officer Torres pushed him in the direction of Mr. Schubert, and at least one protester to Mr. Schubert's right can be seen with his arm pushing Mr. Schubert in the

direction of Officer Torres.  Officer Torres never turns toward Mr. Schubert in any manner that would lead to an inference that Officer Torres thought he was "fighting" Mr. Schubert.

The next image below is taken at :40 on the video.  Mr. Schubert has his right hand formed into a fist, and there is a moment by him in the direction of Officer Torres.  But what the **<u>VIDEO</u>** reveals is that Mr. Shubert had just used

his right elbow to push against the protester to his right in order to stop from being pushed farther in the direction of Officer Torres to his left.



To the extent he forcefully leaned his shoulder into and/or pushed Officer Torres, he did so to maintain space and his balance as Officer Torres and other officers next to him were becoming more aggressive towards other

rioters.  Mr. Schubert does not attribute any ill-motive to Officer Torres – his view is that Officer Torres was executing his duties towards other protesters, and Mr. Schubert was in an unfortunate location at that moment in time.  Mr. Schubert's response did interfere an impede Officer Torres' efforts.

The video continues for another 30 seconds.  Around the :45 mark on the counter Mr. Schubert reacts to be hit in the face with pepper gel.  The video does not show this clearly but Mr. Schubert's reaction is obvious, and Mr. Schubert remembers it being a gel-like substance, not a spray.  From that point in the video forward his actions were all in an effort to escape the confrontation and return to where he had left his parents a short distance away. At the :51 second mark on the video Mr. Schubert disappears back into the crowd behind him.

His total time in proximity to all the Officers in this location is 24 seconds.  His time in close proximity to Officer Torres was only 10 seconds.

Mr. Schubert did not come to Washington with any protective items such as mask, vest or helmet.  He had no weapon. He did not land any kind of offensive blow with malign intent on any of the officers.  As soon as he retreated from the area, he had no further encounters with any other officers throughout the remainder of the afternoon.

As noted above, Mr. Schubert was able to locate his parents a short distance away and they helped to find someone to assist him in trying to wash the chemical irritant off his face.  After that they made contact with Ms. Hudson who had gone around the north side of the Capitol with her dog.

Although their path of travel is not reflected in the PSR, Mr. Schubert and his parents followed others up the stairwell to the Upper Terrace on the northwest corner of the building in their search for Ms. Hudson. As noted in the PSR, Mr. Schubert and his parents entered through the broken window next to the Senate Wing doors at 2:21. This was 8 minutes after the crowd made the initial breach of the building at that same location, with hundreds of protesters entering the building at this location while there was no police presence to slow them until 2:26 – after Mr. Schubert and his parents.

This was, without question, Mr. Schubert's most foolish decision of the afternoon -- helping his elderly parents enter the Capitol through a broken window when the evidence of a violence at that location was all around and alarms were sounding the entire time.

But, hundreds of others had gone in ahead of them and at 2:21 pm there was no law enforcement presence at the Senate Wing doors. As stated above, Mr. Schubert and his parents were told earlier by others in the crowd that the police were allowing people inside the Capitol. They were not in a position at the time this was said to them to know the conditions that existed at the Senate Wing doors or what had happened before they arrived. There were hundreds of protesters in front of them waiting to enter at that location, and there were hundreds of protesters behind them wanting to do the same thing. They were simply waiting in what looked to them like the line to go inside. They did not know what was happening at the entrance when they joined the line, and they did not know what was taking place inside.

The Government has the video evidence of everything Mr. Schubert and his parents did inside the building – they walked around with hundreds of others and took pictures and videos.  When word began to spread that someone had been shot – Mr. Schubert and his parents did not witness the shooting and it is uncertain just how close they were to the location when that happened – Mr. Schubert decided it was time for him to get his parents safely out of the Capitol.  After a short period of time they were able to contact Ms. Hudson and the group departed from the Capitol.

This is contrary to the sinister insinuations at every turn in the Government's view of Mr. Schubert.  But none of those insinuations are based in the relatively straightforward sequence of events reflected in the ten seconds of video showing Mr. Schubert shoulder-to-shoulder with Officer Torres. Mr. Schubert didn't do anything else at any time during the day on January 6 that warrants the descriptions by the Government in its Sentencing Statement.

Although he was close by, Mr. Schubert did not participate in dismantling the first bike rack barrier near the Peace Circle.

Although he was close by, he didn't participate in the confrontation with the police at the second bike rack barrier.

Although he was close by, he was not engaged in physical confrontations with the police on the West front plaza when the police line collapsed and the crowd took control of that area around 2:30 pm.

Although he was close by, he was not involved in the violence or property destruction caused by the crowd that breached the Senate Wing doors and windows.

Although he was close by, he was not at the Speaker's Lobby door when Ashli'i Babbit was shot.

No number of references to "the defendant and other rioters" can involve Mr. Schubert in events he was not actually a part of, even if he was close by at the time.

It was an exercise in poor judgment for Mr. Schubert and his parents to walk past the two barricades after they had been dismantled.

It was an exercise in poor judgment for Mr. Schubert to approach the police line to talk when there were clear signs that there was a potential for an outbreak of violence at that location at that moment given the posture of both sides.

It was an exercise in poor judgment for Mr. Schubert to assist his elderly parents to climb into the Capitol through windows that had clearly been broken out.

But poor judgment is not a basis for a federal prison sentence of more than 2 years as requested by the Government.


2.    <u>Personal History of Mr. Schubert</u>

Mr. Schubert has never had any involvement with law enforcement or the criminal justice system. As reflected in the PSR, the closest he has ever come is a citation for having an unlawful load of construction materials on a non-commercial vehicle in 2014.

The circumstances of Mr. Schubert's life are well captured in the PSR. He grew up in a happy household in Illinois with two siblings.  He graduated

from high school in 1993.  In 1994 he was issued a Plumber's Apprentice license by the State of Illinois.  A suspected allergic reaction to the antibiotic Cyprofloxicin left him unable to work in 2019.[1]  This was followed by the economic slowdown in 2020 and thereafter, caused by the COVID19 pandemic.

His parents divorced after a long marriage when he was an adult.  He has maintained close relationships with his siblings as well as both parents and now his stepparents as well.

He moved to Florida in 2001 where he worked as a plumber for various companies until his allergic reaction in 2019.  Once he recovered, he opted to assist his long-time close friend Ms. Hudson who had a need for someone to provide care for her elderly father who suffered numerous late-in-life health problems.  Ms. Hudson is a schoolteacher, and her only alterative at the time was expensive in-home nursing care.  Mr. Schubert lived with Ms. Hudson and took on the obligation to care for her father in exchange for her supporting the financial needs of the two of them and the household via her fulltime employment.  That situation was been ongoing for nearly three years, however Ms. Hudson's father has recently passed away.

Mr. Hudson has led a quiet and peaceful life for 23 years in Florida, most of it in the companionship of Ms. Hudson.  Their shared life has been largely uneventful – up to January 6, 2021.  He made the trip to Washington D.C. only two days before departing – driving from Florida – with no hotel accommodations in place.  As noted by his biological mother as reflected in the PSR, he made the trip out of concern for the safety of his elderly father and

---

[1] https://my.clevelandclinic.org/health/drugs/18639-ciprofloxacin-tablets

step-mother, who had been to other rallies and planned to attend the rally at the Ellipse on January 6.  But for that concern, he would have been in Bradenton, Florida, on January 6 and not at the United States Capitol.

       B.    <u>The Need for the Sentence Imposed</u>.

Apart from his 10 seconds in physical proximity to Officer Torres, Mr. Schubert's conduct on January 6 is entirely consistent with other January 6 defendants who have pled guilty to misdemeanor offenses, with the vast majority given sentences of probation.

Nothing in Mr. Schubert's background suggests any risk of recidivism in the future.

A custodial sentence in a Bureau of Prisons facility would serve no purpose other than punishment and specific deterrence.

It would punish him for the act of "jostling" back and forth with Officer Torres for some part of 10 seconds.

It would seek to deter Mr. Schubert from future criminal conduct when no such deterrence seems needed given the 28 years of his adult life from high school until January 6, 2021.

       C.    <u>The Kinds of Sentences and Sentencing Range</u>.

Mr. Schubert is asking for a downward variance by the Court from his Total Offense Level of 17 to an Offense Level 11.   With no criminal history this would place Mr. Schubert in Zone B of the Sentencing Table, and give the Court the option to sentence Mr. Schubert to a term of probation with one

condition of probation being a term of some form of community confinement as defined in the guidelines.

E.    Avoiding Unwarranted Sentencing Disparities

With more than 42 months having passed since the events of January 6, this Court has had the opportunity to review the facts of dozens of cases of individuals charged in connection with the events of the day, including numerous individuals convicted of violating Sec. 111(a).

That particular statute can be violated by different conduct stretching across an entire spectrum of activity – from brutal physical violence against an Officer on one end, all the way to mere "opposition" or "intimidation" on the other end.

Because of the spread that exists across this spectrum of conduct, the Guideline Sentencing Range is of little assistance to this Court.  This spectrum must be accounted for beyond the six months in between 24 and 30 months that are recommended by the Guidelines.  More egregious offense conduct on the "assault" end of the spectrum might warrant a sentence greater than 30 months, and less egregious conduct towards the "oppose" and "intimidate" end of the spectrum certainly deserves far less than 2 years in prison.

Mr. Schubert's conduct falls at the far end of the "oppose" side of the spectrum.  His "offense conduct" lasted less than 10 seconds, involved no injury or malign offensive blow struck to the officer, as largely the result of Mr. Schubert finding himself momentarily in a position of being pushed from both sides while in a crowd – one of which happened to have Officer Torres on it carrying out his official duties.

One example of a Sec. 111(a) conviction following a guilty plea that resulted in a 30-month sentence is <u>United States v. Mullins</u>, 21-cr-00035 (RC). Mullins was one of two protesters who grabbed the feet of a U.S. Capitol Police Officer who was laying on his back and dragged down the stairs from the front of the Lower West Terrace tunnel and into the crowd. The Officer was assaulted by others in the crowd while largely defenseless, and suffered injuries that kept him off work for approximately 4 months. Defendant Mullins was sentenced to 30 months – only 3 months longer than the Government is demanding for Mr. Schubert.

A more stark contrast in offense conduct between two 111(a) cases – Mr. Mullins and Mr. Schubert -- is hard to imagine.

In *United States v. Hernandez*, 22-cr-00042 (CRC) this Court has also sentenced 111(a) conviction with much more egregious facts. From Par. 11 of the Statement of Offense for his guilty plea:

> Between 2:35 p.m. and 2:40 p.m., the defendant then made his way to the East Rotunda interior door with a group of rioters. The East Rotunda interior door was guarded by two United States Capitol police officers who stood with their backs to the doors. The defendant joined rioters who gathered around the officers. He then encouraged other rioters by shouting and waiving others to join him in a group push against the officers in order to open the doors to other rioters outside. The defendant braced and pushed against the officers with the group, causing the East Rotunda doors to open to rioters outside of the Capitol. After the push, the defendant moved around the group of rioters, moved the flagpole up, reached with it over top of the group of rioters surrounding the officers, and hit officer B.A. on his riot helmet with the flagpole.

This Court sentenced Mr. Hernandez to 24 months in custody.

In *United States v. Eckerman*, 21-cr-00623 (CRC), the Government

Sentencing Statement described the defendant's offense conduct related to a

111(a) conviction as follows:

> … Eckerman, wearing a tactical vest and neon gloves, participated in three separate breaches of police lines during the twenty minutes he spent inside the United States Capitol building while it was under siege. Eckerman forcibly facilitated one of those breaches himself — an incident forming the basis of Eckerman's count of conviction, a violation of 18 U.S.C. § 111(a)(1) … to which Eckerman pleaded guilty…. Eckerman maneuvered himself to the front of standoff between the mob and a small group of U.S. Capitol Police ("USCP") officers who were guarding a stairway between the Memorial Doors and the Crypt. Shortly after rioters warned the officers that they were about to breach the line, Eckerman pushed USCP officer K.Y. and knocked him off balance, causing him to fall and resulting in a gap in the police line. Rioters, including Eckerman and his two companions, then surged through that gap and climbed the now-accessible stairs, allowing the mob to penetrate the second floor of the Capitol and further complicate police efforts to protect the building and its occupants.

This Court sentenced Eckerman to 20 months in custody.

In *United States v. Egtvedt*, 21-cr-00177 (CRC), this Court heard

testimony at trial that the defendant led a group of rioters trying to make a

second forced entry into the Senate Wing Doors after law enforcement officers

had erected a makeshift barricade at the doors on windows to keep the crowd

outside from entering, while other officers were trying to coerce those inside to

leave the building.  The defendant was successful in leading the group to push

through the barricade and police line at that location for a second time, and

entered the Capitol.  Later, after spending a lengthy period of time inside the

Capitol verbally haranguing officers in various locations, the defendant had a

physical encounter with a female Capitol police offer far less than one-half his

very large size (370 lbs) during which he twice struck the officer's hands as she

attempted to convince him to turn around and exit the building in the direction

he was be instructed to go.  Four officers then joined in the effort to subdue the

defendant, with the group all falling to the ground.  The defendant caused a

rotator cuff injury to the shoulder of one officer who testified about the extreme

pain he felt.

This Court sentenced Egtvedt to 42 months in custody without

acceptance of responsibility.

On the other end of the spectrum of offenses where Sec. 111(a) violations

are the following examples:

In *United States v. Mehaffie*, 21-cr- ____ (TNM), the defendant was

convicted at trial on a 111(a) charge, where the evidence showed that for nearly

20 minutes the defendant hung from the wall next to the Lower West Terrace

tunnel entrance and directed other protesters in and out of the tunnel in a

coordinated effort to break through the police line that was established inside.

In his verdict, Judge McFadden expressly found that Mehaffie had not

"assaulted" any officers, but his conduct nevertheless violated Sec. 111(a) when

considering the broad spectrum of conduct that is potentially within the scope

of that statute's language.

Judge McFadden sentenced Mehaffie to **14 months** in custody.

In *United States v. Leffingwell*, 21-cr-00005 (ABJ), the defendant made it

just inside the Senate Wing doors at approximately 4:00 pm, a time when

police had regained control over nearly all the interior of the Capitol.  Two

officers attempted to prevent the defendant from getting further into the

interior of the Capitol at that location.  The Statement of Facts in support of his

guilty plea stated that Leffingwell landed offensive blows on the officers, punched one of the officers twice, and the second officer one time when resisting their efforts to detain and arrest him.

Judge Jackson sentenced Leffingwell to **6 months** in custody.

In *United States v. Young*, 21-cr-00617 (DLF), the defendant went to trial and was convicted of a violation of Sec. 111(a) as well as misdemeanors. The Government Sentencing Statement described his conduct as follows:

> Young ... joined others in attacking a police line [on the Upper West Terrace] after someone in the crowd shouted "one, two, three, go!" He, along with several other rioters, lifted and pushed a metal bicycle rack barricade into a wall of officers. Approximately 30 minutes later, he attacked another line of officers in the same location. This time, the crowd was larger. After a rioter was told by law enforcement to get back and that individual was pepper sprayed. In response, Young joined a throng of people that moved forward pushing the barricades. Young and others backed up only after being pepper sprayed by police. But Young was not finished. He made his way to the east side of the Capitol, and in an effort to sabotage law enforcement, let the air out of the tire of a government vehicle.

Judge Friedrich sentenced Young to only **8 months** in custody.

In *United States v. Sherrill*, 21-cr-00282 (TSC), the defendant pled guilty to a Sec. 111(a) offense that involved using a metal pipe as a weapon. The defendant admitted to striking an MPD Officer with the pipe.

Judge Chutken sentenced the defendant to only **7 months** in custody.

CONCLUSION

As is clear from the totality of the actual evidence reflecting what Mr. Schubert did, his is one of the most benign forms of opposing, impeding, or interfering with a United States Capitol Police Officer on January 6.

While volitional, Mr. Schubert's forceful contact with Officer Torres was not done out of malign intent to bring any harm to Officer Torres or anyone else. It was contact that was the result of the specific factual circumstances he had walked himself into as a result of several misguided and foolish decisions that brought him to the place where protesters and police was clashing early in the afternoon on January 6.

Based on Mr. Schubert's actual conduct as reflected on the video, consider in the context of the 10 seconds at issue, a sentence of 24 months of probation, with a condition that 8 months of that probation be served under a condition of "home detention," is an appropriate sentence for Mr. Schubert's actions towards Officer Torres.

Dated: July 6, 2024                                  Respectfully submitted,

                                                     /s/ William L. Shipley
                                                     William L. Shipley, Jr., Esq.
                                                     PO BOX 745
                                                     Kailua, Hawaii 96734
                                                     Tel: (808) 228-1341
                                                     Email: 808Shipleylaw@gmail.com

                                                     *Attorney for Defendant*